UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Kathy Groebner and John Groebner, individually, and as parents and natural guardians for minor K.G.,

Plaintiff,

vs.

Immanuel St. Joseph's – Mayo Health System; Immanuel St. Joseph's Hospital – Mayo Health System; Immanuel St. Joseph's Clinic – Mayo Health System; Immanuel St. Joseph's Clinic – Northridge – Mayo Health System; Immanuel St. Joseph's Clinic – Eastridge – Mayo Health System; Mayo Clinic; Mayo Clinic – Rochester; Mayo Clinic – Rochester d/b/a Mayo Clinic; Mayo Holding Company d/b/a Mayo Health System; Gerald Kowal, D.O.; Michael Sparacino, D.O.; Catherine Davis, M.D.; Stephen Campbell, M.D.; Anna Melynne Youngblood, M.D.; Darla Theobald R.N./C.N.P.; Joseph Gee, M.D.; Barbara Allen, M.D.; Denesh Chitkara, M.D.; Deborah Freese, M.D.; and Sara Beske, C.N.P.,

Defendants.

Case No.: 09CV 1708 MJD/JJK

**COMPLAINT
AND
DEMAND FOR JURY TRIAL
REDACTED PURSUANT TO
FED. R. CIV. P. 5.2**

Plaintiffs, for their Complaint and cause of action against the above-named defendants, state and allege on information and belief as follows:

**PARTIES, JURISDICTION & VENUE**

**I.**

Plaintiffs Kathy and John Groebner are the parents and natural guardians of minor plaintiff K.G., and presently reside at 1187 Pine Lane in Clayton, California 94517.

**II.**

At all relevant times, defendants Immanuel St. Joseph's – Mayo Health System, Immanuel St. Joseph's Hospital – Mayo Health System, Immanuel St. Joseph's Clinic – Mayo

**SCANNED**

JUL 02 2009

Health System, Immanuel St. Joseph's Clinic – Northridge – Mayo Health System, Immanuel St. Joseph's Clinic – Eastridge – Mayo Health System and Mayo Holding Company d/b/a Mayo Health System (hereinafter collectively referred to as "Immanuel St. Joseph's") were Minnesota non-profit corporations operating health care facilities and in connection therewith, employed the services of physicians, nurses, and other health care providers and held them out and warranted them to the public to be competent, careful, and experienced in the care and treatment of patients.

### III.

At all relevant times, Mayo Clinic, Mayo Clinic – Rochester, and Mayo Clinic – Rochester d/b/a Mayo Clinic (hereinafter collectively referred to as "Mayo Clinic") were Minnesota non-profit corporations operating health care facilities and in connection therewith, employed the services of physicians, nurses and other health care providers and held them out and warranted them to the public to be competent, careful and experienced in the care and treatment of patients.

### IV.

At all relevant times, Gerald Kowal, D.O. was a physician licensed to practice medicine in the state of Minnesota and held himself out and warranted himself to the public as competent, careful, and experienced in the practice of medicine.

### V.

At all relevant times, Michael Sparacino, D.O. was a physician licensed to practice medicine in the state of Minnesota and held himself out and warranted himself to the public as competent, careful, and experienced in the practice of medicine.

### VI.

At all relevant times, Catherine Davis, M.D. was a physician licensed to practice

medicine in the state of Minnesota and held herself out and warranted herself to the public as competent, careful, and experienced in the practice of medicine.

## VII.

At all relevant times, Stephen Campbell, M.D. was a physician licensed to practice medicine in the state of Minnesota and held himself out and warranted himself to the public as competent, careful, and experienced in the practice of medicine.

## VIII.

At all relevant times, Anna Melynne Youngblood, M.D. was a physician licensed to practice medicine in the state of Minnesota and held herself out and warranted herself to the public as competent, careful, and experienced in the practice of medicine.

## IX.

At all relevant times, Joseph Gee, M.D. was a physician licensed to practice medicine in the state of Minnesota and held himself out and warranted himself to the public as competent, careful, and experienced in the practice of medicine.

## X.

At all relevant times, Barbara Allen, M.D. was a physician licensed to practice medicine in the state of Minnesota and held herself out and warranted herself to the public as competent, careful, and experienced in the practice of medicine.

## XI.

At all relevant times, Darla Theobald, R.N./C.N.P. was a resident of Minnesota and a nurse licensed to practice medicine in the state of Minnesota and held herself out and warranted herself to the public as competent, careful, and experienced in the practice of nursing.

## XII.

At all relevant times, Sara Beske, C.N.P. was a resident of Minnesota and a certified

nurse practitioner licensed to practice medicine in the state of Minnesota and held herself out and warranted herself to the public as competent, careful, and experienced in the practice of nursing.

## XIII.

At all relevant times, defendants Immanuel St. Joseph's operated health care facilities in Minnesota, and in connection therewith, employed the services of physicians, nurses and other health care providers, including defendants Dr. Gerald Kowal, Dr. Michael Sparacino, Dr. Catherine Davis, Dr. Stephen Campbell, Dr. Anna Melynne Youngblood, Dr. Joseph Gee, Dr. Barbara Allen, Darla Theobald and Sara Beske, and held them out and warranted them to the public to be competent, careful and experienced in the care and treatment of patients.

## XIV.

At all relevant times, defendants Dr. Gerald Kowal, Dr. Michael Sparacino, Dr. Catherine Davis, Dr. Stephen Campbell, Dr. Anna Melynne Youngblood, Dr. Joseph Gee, Dr. Barbara Allen, Darla Theobald and Sara Beske were principals, agents, employees, shareholders and/or partners of Immanuel St. Joseph's, and acted within the scope of their authority.

## XV.

Immanuel St. Joseph's is vicariously and/or contractually liable for the actions of its principals, agents, employees, shareholders and partners, including Dr. Gerald Kowal, Dr. Michael Sparacino, Dr. Catherine Davis, Dr. Stephen Campbell, Dr. Anna Melynne Youngblood, Dr. Joseph Gee, Dr. Barbara Allen, Darla Theobald and Sara Beske.

## XVI.

At all relevant times, Denesh Chitkara, M.D. was a physician licensed to practice medicine in the state of Minnesota and held himself out and warranted himself to the public as competent, careful, and experienced in the practice of medicine.

## XVII.

At all relevant times, Deborah Freese, M.D. was a physician licensed to practice medicine in the state of Minnesota and held herself out and warranted herself to the public as competent, careful, and experienced in the practice of medicine.

## XVIII.

At all relevant times, defendants Mayo Clinic operated health care facilities in Minnesota, and in connection therewith, employed the services of physicians, nurses and other health care providers, including defendants Dr. Denesh Chitkara and Dr. Deborah Freese, and held them out and warranted them to the public to be competent, careful and experienced in the care and treatment of patients.

## XIX.

At all relevant times, defendants Dr. Denesh Chitkara and Dr. Deborah Freese were principals, agents, employees, shareholders and/or partners of Mayo Clinic, and acted within the scope of their authority.

## XX.

Mayo Clinic is vicariously and/or contractually liable for the actions of its principals, agents, employees, shareholders and partners, including Dr. Denesh Chitkara and Dr. Deborah Freese.

## XXI.

This action is properly before the United States District Court for the District of Minnesota because there exists complete diversity of citizenship between plaintiffs and all defendants. In addition, the amount in controversy claimed by plaintiffs, exclusive of interest and costs, exceeds Seventy-five Thousand Dollars ($75,000). As a result, this Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a).

## XXII.

Defendants are subject to the *in personam* jurisdiction of the United States District Court for the District of Minnesota, and venue is proper herein pursuant to 28 U.S.C. § 1391, because each of the defendants reside in Minnesota and/or committed a tort against plaintiffs in Minnesota, as more fully set forth herein.

## FACTUAL ALLEGATIONS AND DAMAGES

## XXIII.

K.G. was born at Immanuel St. Joseph's Hospital on XXXXX 2002. At her one minute assessment after birth, she was pale blue in color. At her five minute assessment, K.G.'s body was pink, but her extremities were still blue in color.

## XXIV.

While in the hospital following her delivery, defendants Kowal and Gee examined K.G.. By July 19, 2002, K.G. was more sleepy and not nursing as well. After her discharge from the hospital, K.G. was scheduled to return to the hospital for a weight check and a visit with a lactation consultant, and she was directed to follow up in two weeks.

## XXV.

On July 27, 2002, K.G. was taken to the emergency room at Immanuel St. Joseph's Hospital for complaints of projectile vomiting that had started two days earlier. K.G.'s mother, Kathy Groebner, also reported that K.G. did not seem to be breathing right. She was seen in the emergency room and underwent the chest x-ray, K.G. had an episode of apnea that lasted 7-10 seconds, during which she became purple.

## XXVI.

K.G. remained hospitalized until July 28, 2002. During her hospitalization, defendants Sparacino and Davis examined her. Kathy Groebner reported that K.G. had experienced some

projectile vomiting with color change, and difficulty breathing with color change. Kathy Groebner also reported that, initially, K.G. had been very sleepy and was only getting two good sessions of breastfeeding per day, but that had slowly improved and K.G. was now eating six times per day. Kathy reported that, while breastfeeding, K.G. sucked vigorously, inhaled, and then stopped breathing for seconds, and Kathy had to blow on K.G.'s face to wake her up.

### XXVII.

Defendant Sparacino diagnosed idiopathic apnea and stated that tracheoesophageal anomaly needed to be ruled out. Defendant Davis, a pediatrician, noted that K.G. had a slow heart rate at times, decreasing down to 80, and she also noted that the upper GI that K.G. underwent was fairly unremarkable.   Defendant Davis diagnosed K.G. with reflux, recommended elevating the head of the bed and starting Prilosec, suggested an apnea monitor, and planned to have her follow up with defendant Kowal in a few days. Defendant Sparacino suggested to K.G.'s parents that an apnea monitor was unnecessary, and discharged K.G. home without one.

### XXVIII.

After a well-check exam on July 31, 2002 with defendant Kowal, K.G. next saw defendant Sparacino on August 5, 2002. At that visit, Kathy Groebner reported that K.G. was still vomiting and turning blue. Defendant Sparacino increased her dosage of Prilosec for the reflux.

### XXIX.

Defendant Campbell saw K.G. on August 30, 2002, when K.G. was six weeks old, because she had not had a bowel movement for four days. Defendant Campbell diagnosed her with constipation and recommended diluted prune juice, water, and a ½ pediatric glycerin suppository. He also noted that she had recently been placed on Diflucan for thrush, which had

been prescribed by defendant Kowal on August 26, 2002.

### XXX.

K.G. saw defendant Kowal for well-child exams on September 12, 2002 and November 21, 2002.

### XXXI.

In December of 2002, K.G. saw defendant Kowal approximately three times for complaints of vomiting, diarrhea, chest congestion, and a cough that was worse at night. She underwent a chest x-ray on December 9, 2002. Defendant Kowal treated her with an antibiotic, antihistamine and decongestant.

### XXXII.

After another well-check visit on January 13, 2003, K.G. returned to see defendant Kowal on February 3, 2003, for her cough. At that visit, Kathy reported to defendant Kowal that, since her birth, K.G. stopped breathing at times, even while she was awake, and Kathy had to shake her or throw cold water in her face to get her to start breathing. Kathy also reported her concerns that K.G. did not smile, laugh or play like other children her age. Defendant Kowal prescribed an antibiotic for K.G.'s cough, and planned a work-up for her breathing abnormality with pediatric pulmonary medicine. He referenced the possibility that K.G. was having seizures.

### XXXIII.

On February 7, 2003, defendants Dr. Youngblood and Theobald saw K.G. to evaluate her apnea episodes. Kathy again told defendants Youngblood and Theobald that, at 11 days old, K.G. had projectile vomiting with an associated apnea episode lasting approximately two minutes, with color changes. She also reported that K.G. used to have apnea episodes two to three times per week, which were witnessed by other family members and other health care professionals. Kathy reported that K.G. suffered from persistent nasal congestion, had been

8

treated for sinus infection twice since birth, and was currently on medication for sinusitis. Because of her difficulty breathing, K.G. latched on and off the breast while nursing.  In addition, K.G. had a persistent cough, including every night and even when she was well, and she currently had an upper respiratory infection with an increased cough.

## XXXIV.

Defendant Youngblood reviewed the chest x-ray from December 9, 2002.  Defendant Youngblood's impression was that K.G.'s apnea episodes may be multi-factorial, including gastroesophageal reflux disease (GERD) and possibly obstructive sleep apnea given the physical findings.  Defendant Youngblood also noted the possibility of an anatomic abnormality or other potential causes.  With regard to K.G.'s cough, defendant Youngblood concluded that it may be secondary to GERD, but noted that she could not rule out a component of reactive airway disease, bronchietic disease, cystic fibrosis, sinopulmonary process or some other cause. Defendant Younglood increased K.G.'s prescription for Prilosec, started her on Flovent, and requested an overnight oximetry and a follow-up visit in two weeks.

## XXXV.

On February 21, 2003, defendant Theobald saw K.G. for her follow-up visit, reviewed her oximetry results and concluded that K.G.'s apnea episodes and her cough were most likely secondary to GERD.  Defendant Theobald continued K.G.'s prescription for Prilosec and instructed her to follow up in one month.

## XXXVI.

Defendant Gee saw K.G. on March 5, 2003, for an upper respiratory infection, which he treated with antibiotics. She also followed up with defendant Theobald on March 28, 2003.

## XXXVII.

On April 4, 2003, K.G. again returned to defendant Gee with complaints of irritability, congestion, fever and vomiting. She was also not sleeping. He diagnosed an upper respiratory infection and prescribed antibiotics and Tylenol or Ibuprofen for her fever.

## XXXVIII.

After her well-check visit with defendant Kowal on May 12, 2003, K.G. returned to see defendant Theobald on May 30, 2003. At that visit, defendant Theobald noted that K.G. was anemic and that her growth and weight had slowed. Defendant Theobald concluded that K.G.'s conditions might be secondary to an increased difficulty with the introduction of new foods, but she was unable to exclude more ominous causes such as cystic fibrosis, immunological processes or other causes. She ordered a sweat chloride test to evaluate K.G. for cystic fibrosis, which was normal.

## XXXIX.

On June 9, 2003, K.G. went to the clinic for an office visit. Defendant Beske treated her, noting that she had a cough.

## XL.

After undergoing another chest x-ray on June 23, 2003, K.G. returned to defendants Youngblood and Theobald on June 24, 2003. K.G.'s father reported that, while she was eating a cracker, K.G. began choking and turned gray, especially around the nose and mouth. She lost consciousness, but awoke a short time later. Both Kathy and John Groebner reported that they believed K.G. had difficulty swallowing, because she often gagged and she had experienced some choking type episodes while nursing. K.G. also seemed disinterested in chewing foods. They also reported that she coughed most nights, and they were concerned that her reflux was becoming worse. Defendants concluded that the choking episode was most likely due to

laryngospasm. They noted that her sweat chloride was negative and they recommended another upper GI.

### XLI.

On July 28, 2003, defendant Kowal wrote a letter to the pediatric gastroenterology department at the Mayo clinic. In that letter, defendant Kowal reported that K.G. had significant gastroesphageal reflux disease. He stated that she continued to have marked reflux, despite being on the near maximum dosage of Prilosec, and as a result, the pulmonary department had suggested a consultation with a pediatric gastroenterologist.

### XLII.

Defendants Youngblood and Theobald saw K.G. again on August 1, 2003. They noted that K.G.'s cough had increased, and she was waking up every two hours at night. She was also spitting up and slightly constipated. K.G. was not feeding herself, did not tend to put anything in her mouth, and was reluctant to eat any baby or table food. The upper GI, which had been performed on July 2, 2003, showed moderate to marked gastro esophagus reflux into the proximal esophagus. Defendants diagnosed her with GERD and increased her Prilosec and Flovent prescriptions. In addition, they prescribed Albuterol, gave Kathy Groebner a handout on the signs and symptoms of respiratory distress and requested a follow-up visit in six weeks.

### XLIII.

On August 5, 2003, defendant Kowal saw K.G. for her one-year well check. K.G. was also seen on September 3, 2003 by defendant Gee for an upper respiratory infection, and on September 8, 2003 by defendant Allen for a fever. Defendants Gee and Allen prescribed antibiotics at each of their respective visits.

### XLIV.

In August and September of 2003, K.G. went to the Mayo Clinic for additional

11

evaluation and testing, including another chest x-ray, which showed patchy areas of probable atelectasis in the left lung. She also underwent a esophagogastroduodenoscopy with biopsies, which were reportedly normal. Defendant Chitkara concluded that the nuclear medicine gastric emptying study performed on K.G. was borderline abnormal, and he planned to continue her on Prilosec.

## XLV.

K.G. had her 15-month well check with defendant Gee on October 15, 2003. Kathy Groebner reported that K.G. was having upper respiratory symptoms and that her appetite was decreased over the previous two weeks. Kathy Groebner also reported that K.G.'s day care said that K.G. "spaced out" at times. Kathy described incidents where she could waive her hands in front of K.G.'s face without any response for a few seconds. Defendant Gee noted that K.G. was significantly behind on her developmental milestones, and that she had experienced a gradual decrease on the growth curve. He planned to obtain a pediatric consultation for the developmental delay and the possible seizures. On October 24, 2003, K.G. returned to defendant Gee with complaints of not sleeping through the night. She was diagnosed with an upper respiratory infection and a fever, and defendant Gee recommended Tylenol or Ibuprofen for the fever or discomfort.

## XLVI.

K.G. returned to see defendant Theobald on December 11, 2003 with a cough, and she was diagnosed with an upper respiratory infection. She increased K.G.'s Flovent prescription.

## XLVII.

In January of 2004, K.G. had another gastroenterology consultation with defendant Freese at the Mayo Clinic, for reflux and reactive airway disease. Defendant Freese concluded that K.G.'s reflux was fairly well controlled, but noted that she had fairly significant reactive

airway disease which had not improved, and suggested a prescription for Reglan. Kathy Groebner reported to defendant Freese that K.G. had significant developmental delays in gross motor skills, speech, and language/social communication. Defendant Freese noted an approximately six-month delay in K.G.'s gross motor skills, such as sitting independently, pulling herself to a stand and walking. Defendant Freese also noted that K.G. had only just started saying "mama" and "dada" at eighteen months of age, which is a skill normally displayed at age 10-12 months. Defendant Freese ordered some preliminary screening for inborn errors of metabolism that showed minimal increase in glycosaminoglycan levels, which were likely not significant. Defendant Freese recommended that the screen be repeated.

## XLVIII.

K.G. saw defendant Theobald again on January 9, 2004 for continued cough and decreased weight. Defendant Theobald diagnosed GERD, kept her on Prilosec and Reglan, and increased her Flovent prescription.

## XLIX.

On May 4, 2004, K.G. had a well check with defendant Kowal, who noted that she had a cough secondary to GERD and that she had a few more GERD symptoms.

## L.

Defendant Kowal wrote to defendant Freese on August 5, 2004, in anticipation of an upcoming appointment that K.G. had with defendant Freese. In that letter, defendant Kowal wrote that K.G. had developed blisters on her tongue, which he associated with her acid reflux.

## LI.

K.G. underwent another upper GI on September 16, 2004, and another esophagogastroduodenoscopy with triple biopsies on September 17, 2004. After K.G.'s visit with defendant Freese in September, defendant Freese wrote to defendant Kowal that K.G. was

slightly dysmorphic. She had detected a 1/6 systolic murmur at the cardiac base. She further noted that K.G. had a "geographic tongue," and wrote that her tongue lesions might be affecting her appetite because they hurt at times. Defendant Freese thought that K.G. might be developing cyclic neutropenia and/or that she might be becoming tachyphylactic to Reglan. Defendant Freese switched K.G. from Prilosec to Prevacid, she discontinued the Reglan, and she started her on erythromycin.

## LII.

From November 1, 2004 through February 8, 2006, K.G. was seen by defendants Kowal, Gee, Sparacino and Beske no less than six times for complaints of coughing, upper respiratory infections, breathing difficulties, and/or fevers. Defendants prescribed antibiotics and other medications at these visits. She was also seen on August 1, 2005 for ear pain, diarrhea and diaper rash, and on February 8, 2006 for the presence of blood and mucous in her stool.

## LIII.

K.G. had a well-check visit with defendant Kowal on October 5, 2006, at four years of age. He noted concerns about her acid reflux symptoms, nasal congestion, rhinorrhea, and complaints of joint ache. Developmentally, K.G. was not dressing herself, reciting the alphabet, or counting.

## LIV.

On March 2, 2007, K.G. went to see defendant Gee for a cough that had persisted for one month and a fever. She also had lesions under her right arm. Defendant Gee diagnosed her with an upper respiratory infection and prescribed an antibiotic.

## LV.

On August 1, 2007, K.G. was seen by defendant Kowal for cold symptoms and pain with urination. Defendant Kowal diagnosed purulent rhinorrhea, dysuria, and a rash, and he treated

her with antibiotics, an antihistamine, and a topical ointment for her rash.

## LVI.

In December of 2007, K.G. went in to the clinic with complaints of a persistent cough and cold and was seen by Joel Gordon, M.D. He examined K.G. and discovered a 3/6 whole systolic murmur at the left sternal base, radiating more toward the apex. Dr. Gordon ordered a chest x-ray, which revealed a double density behind the heart and some mild cardiomegaly, with a prominent right ventricle and prominent main pulmonary artery. Dr. Gordon ordered an echocardiogram and referred her to a pediatric cardiologist.

## LVII.

The echocardiogram revealed findings consistent with moderate to severe pulmonary hypertension, moderate right ventricular enlargement, increased right ventricular wall thickness which was at least moderate, and mild to moderate pulmonary valve regurgitation. A large patent ductus arteriosus (PDA) was not excluded by the images.

## LVIII.

By January of 2008, K.G. had undergone extensive testing and had been evaluated by both Dr. Charles Baker at the Children's Heart Clinic, and Dr. Steven Kurachek, at Children's Respiratory and Critical Care Specialists, in Minneapolis. Dr. Kurachek documented the reports of significant apnea that K.G. had experienced, particularly in the first three years of her life. In addition to the abnormal chest x-ray, he noted that a CT scan had revealed a small ductus arteriosus, large pulmonary arteries, and areas of plate-like atelectasis with subsegmental areas of mild hyperinflation consistent with mucus trapping and airway obstruction to a limited degree. He also detected a murmur, and noted that she was cognitively delayed and appeared somewhat slow and weak in terms of her motor activity. He diagnosed pulmonary arterial hypertension.

## LIX.

Defendants, individually and collectively, were negligent in their care and treatment of K.G.. Such negligence included, by way of example but not limitation, the following:

A.     Failure to properly and timely assess, diagnose, and monitor K.G.'s patent ductus arteriosus, pulmonary artery hypertension, and/or other medical conditions that resulted in her development of pulmonary artery hypertension;

B.     Failure to properly and timely treat K.G.'s patent ductus arteriosus, pulmonary artery hypertension, and/or other medical conditions that resulted in her development of pulmonary artery hypertension;

C.     Failure to perform appropriate diagnostic tests in a timely manner;

D.     Failure to properly refer K.G. to a qualified specialist in a timely manner;

and defendants were in other ways negligent in the care and treatment of K.G..

## LX.

Defendants' negligence was a direct and substantial cause of the injuries and damages sustained by plaintiffs.

## LXI.

Immanuel St. Joseph's is vicariously and/or contractually liable for the actions of its principals, agents, employees, shareholders and partners, including Dr. Gerald Kowal, Dr. Michael Sparacino, Dr. Catherine Davis, Dr. Stephen Campbell, Dr. Anna Melynne Youngblood, Dr. Joseph Gee, Dr. Barbara Allen, Darla Theobald and Sara Beske.

## LXII.

Mayo Clinic is vicariously and/or contractually liable for the actions of its principals, agents, employees, shareholders and partners, including Dr. Denesh Chitkara and Dr. Deborah Freese.

**LXIII.**

As a direct and proximate cause of defendants' negligence, plaintiff K.G. has sustained permanent and devastating injuries to her mind and body. Said injuries have resulted, and will continue to result, in a substantial reduction in her physical and emotional capacity, and her capacity to enjoy life and participate in daily activities, and said injuries have caused her pain, disability, disfigurement, and emotional distress all to her damage in a sum in excess of Seventy-five Thousand Dollars ($75,000.00).

**LXIV.**

As a direct and proximate cause of defendants' negligence, plaintiff K.G. will be required to expend substantial sums of money for medical, rehabilitative and related care, services, and special equipment as a result of her injuries, after her majority, all to her damage in a sum presently estimated to be in excess of Seventy-five Thousand Dollars ($75,000.00).

**LXV.**

As a direct and proximate cause of defendants' negligence, plaintiff K.G. has sustained a significant loss of earning capacity all to her damage in a sum presently estimated to be in excess of Seventy-five Thousand Dollars ($75,000.00).

**LXVI.**

As a direct and proximate cause of defendants' negligence, plaintiffs Kathy and John Groebner have incurred in the past and will continue in the future to incur significant expenses in the form of medical, rehabilitative and related care, services, and special equipment required by their daughter, K.G., all to their damage in a sum presently estimated to be in excess of Seventy-five Thousand Dollars ($75,000.00).

**LXVII.**

As a direct and proximate cause of defendants' negligence, plaintiffs Kathy and John

Groebner have been in the past and will continue in the future to be required to render special services to their daughter, K.G., and have incurred, and will incur, a loss of earnings in connection with providing these services all to their damage in a sum presently estimated to be in excess of Seventy-five Thousand Dollars ($75,000.00).

WHEREFORE, plaintiffs pray for judgment against defendants in an amount in excess of Seventy-five Thousand Dollars ($75,000.00), together with costs and disbursements incurred herein, prejudgment interest, and such other and further relief as the Court shall deem appropriate.

## JURY DEMAND

Plaintiffs hereby request a trial by jury, pursuant to Rule 38 of the Federal Rules of Civil Procedure, on all claims and issues so triable.

DATED: _July 2_, 2009

**ROBINS, KAPLAN, MILLER & CIRESI L.L.P.**

By: _Cindy L. Butler_

Chris A. Messerly (MN #177039)
Cindy L. Butler (MN #328248)

2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402-2015
612-349-8500

**ATTORNEYS FOR PLAINTIFFS**

## ACKNOWLEDGMENT REQUIRED BY
## MINN. § 549.21, SUBD. 2

The undersigned hereby acknowledges that, pursuant to Minn. Stat. § 549.21, subd. 2,

costs, disbursements and reasonable attorney and witness fees may be awarded to the opposing

part or parties in this litigation if the Court should find the undersigned acted in bad faith,

asserted a claim or defense that is frivolous and that is costly to the other party, asserted an

unfounded position solely to delay the ordinary course of the proceedings or to harass, or

committed a fraud upon the Court.

DATED: _July 2_, 2009

**ROBINS, KAPLAN, MILLER & CIRESI L.L.P.**

By: _Cindy L. Butler_

Chris A. Messerly (MN #177039)
Cindy L. Butler (MN #328248)

2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN  55402-2015
612-349-8500

**ATTORNEYS FOR PLAINTIFFS**